**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

```
_____
                              :
EDMUND K. MAWHINNEY           :
and MICHAEL V. FRANCESCO,     :
                              :    Civil Action No.
          Plaintiffs,         :    08-cv-3317 (NLH) (JS)
                              :
                              :
     v.                       :
                              :    OPINION
KEVIN A. BENNETT,             :
individually,                 :
DOMENIC CAPPELLA, individually:
and in his official capacity  :
as the Atlantic City Business :
Administrator and/or Assistant:
Business Administrator, and   :
THE ATLANTIC CITY VULCANS,    :
Atlantic City Chapter of the  :
International Association of   :
Black Professional            :
Firefighters, jointly,        :
severally, and in the         :
alternative,                  :
                              :
          Defendants.         :
_____:
```

**Appearances:**

Michelle J. Douglass, Esquire
The Douglass Law Firm, LLC
1601 Tilton Road
Suite 6
Northfield, NJ 08225
*Attorney for Plaintiffs Edmund K. Mawhinney and Michael V. Francesco*

Michael E. Riley, Esquire
Law Offices of Riley & Riley
The Washington House
100 High Street
Suite 302
Mount Holly, NJ 08060
*Attorney for Defendant Kevin A. Bennett*

Patrick J. Wolfe, Esquire
Zarwin, Baum, DeVito, Kaplan, Schaer & Toddy, P.C.

Five Greentree Center
Suite 303
Marlton, NJ 08053-3422
*Attorney for Defendant Domenic Cappella*

Lucas E. Phillips, Jr., Esquire
134 Evergreen Place
Suite 301
P.O. Box 2487
East Orange, NJ 07019
*Attorney for Defendant the Atlantic City Vulcans*

**HILLMAN, District Judge**

Plaintiffs, Edmund K. Mawhinney and Michael V. Francesco
(or, collectively "plaintiffs"), filed a complaint in this Court
against Kevin A. Bennett, a captain of the Atlantic City Fire
Department and the President of the Atlantic City Chapter of the
Vulcans Organization; Domenic Cappella, the Business
Administrator and, later, the Assistant Business Administrator
for the City of Atlantic City; the City of Atlantic City
("City"); and the Atlantic City Vulcans ("Vulcans"), a chapter
and member of the International Association of Black
Firefighters.  Relevant to this Opinion, plaintiffs allege in
their complaint that Bennett tortiously interfered with their
economic advantages and defamed them.

Bennett has moved to dismiss plaintiffs' claims against him.
For the reasons set forth below, Bennett's Motion to Dismiss will
be granted.

**I.   JURISDICTION**

Plaintiffs set forth a federal civil rights claim pursuant

2

to 42 U.S.C. § 1983, as well as state law claims in accordance
with New Jersey law.  This Court has subject matter jurisdiction
over plaintiffs' federal civil rights claim pursuant to 28 U.S.C.
§ 1331.  Further, this Court may exercise supplemental
jurisdiction over plaintiffs' related state law claims pursuant
to 28 U.S.C. § 1367.

## II.  BACKGROUND[1]

Plaintiff, Edmund Mawhinney, was a firefighter with the
Atlantic City Fire Department ("ACFD") from August 29, 1979 until
September 19, 2006.  At the time of his termination in September
2006, Mawhinney held the rank of captain.  Plaintiff, Michael
Francesco, has been a firefighter with the ACFD since April 28,
1998 and currently holds the rank of captain.  Plaintiffs are
Caucasians.

On December 30, 2005, plaintiffs each filed suit in the
Superior Court of New Jersey, naming as a defendant, among
others, the City.  In their respective complaints, plaintiffs
maintained that they were the targets of disciplinary actions and
other adverse treatment because they recommended disciplinary

---

[1] The following facts are culled from plaintiffs' complaint
filed in this Court and are largely adopted from this Court's
prior opinion in this case, Mawhinney v. Bennett, 2010 U.S. Dist.
LEXIS 1715 (D.N.J. Jan. 11, 2010).  Given that the present matter
comes before the Court by way of Bennett's Motion to Dismiss,
plaintiffs' allegations are accepted as true and viewed in a
light most favorable to them, as is required when reviewing a
motion to dismiss.  See Evancho v. Fisher, 423 F.3d 347, 350 (3d
Cir. 2005).

3

action against Ricky Williams, an African-American firefighter
with the ACFD, who purportedly violated ACFD rules and
regulations.

On May 7, 2007, several months after he had been terminated
from his job, Mawhinney filed an amended complaint in the
Superior Court, adding Bennett and Williams as defendants.  In
the amended complaint, Mawhinney claimed that Bennett and
Williams brought frivolous charges of racial discrimination
against him, resulting in his wrongful termination.  Mawhinney
also alleged that "[a]ny charge[s] against Bennett or Williams
were dismissed, without investigation, because of their race,"
and, again, that Williams had never been disciplined for his
infractions.  On the contrary, Mawhinney averred that an African-
American city official, responsible for investigating allegations
made against him, "influenced and/or misrepresented the testimony
of witnesses she interviewed in order to reach a racially
motivated pre-determined conclusion of guilt against Mawhinney
based on the charges made by Williams."[2]

Plaintiffs' state court actions were settled, respectively.
However, on July 3, 2008, plaintiffs jointly filed a complaint in
this Court.  In response, the City and the Vulcans filed motions
to dismiss plaintiffs' claims against them.  On January 11, 2010,

---

[2] Mawhinney's amended complaint highlights other instances of
alleged racial discrimination perpetrated by the City,
specifically with regard to hiring and promoting firefighters.

4

the Court granted the City's motion based on the entire
controversy doctrine, but denied the Vulcans' request that the
Court refrain from exercising supplemental jurisdiction over
related state law claims.

Following the submission of the City's and the Vulcans'
motions, Bennett moved for dismissal of all claims against him.
The following facts are germane to plaintiffs' federal action and
the disposition of the present matter.

**A.   Edmund K. Mawhinney**

On September 19, 2006, Mawhinney was terminated as a result
of accusations of racism made by Bennett and Williams.  A week
later, he appealed the termination to the Office of
Administrative Law ("OAL"), averring that any allegations of
racial misconduct were false.  Several of the disciplinary
charges against Mawhinney were subsequently dismissed by the OAL
judge.

In December 2007, the City and Mawhinney agreed to enter
into a settlement whereby the City would dismiss all disciplinary
charges against Mawhinney, reinstate him, make payment of back
pay and benefits totaling $199,148.44, and allow for his
retirement with an application for pension and the provision of
health care coverage for him and his wife.  The parties agreed
that the settlement agreement was to remain confidential and that
it would be presented to City Council for final approval on

December 28, 2007.

Prior to the City Council meeting, Bennett contacted a local radio station and, while on the air, disclosed the terms of the settlement agreement and restated his accusations of Mawhinney's racist conduct.  In response, Mawhinney filed a complaint with the ACFD, outlining Bennett's behavior and noting that it constituted a violation of both the settlement agreement and the ACFD's rules and regulations.

On December 28, 2007, Bennett left the firehouse to attend the City Council meeting at which the settlement agreement between Mawhinney and the City would be addressed.  Although Bennett was not authorized to leave his workplace and did not secure proper relief, he received only a minor disciplinary action in the form of a reprimand.  At the City Council meeting, Bennett attempted to persuade the Council to reject the settlement agreement because Mawhinney had committed a racist act.  In support of his advocation, Bennett rallied a group of African-Americans, including Vulcans, to attend the meeting, and displayed and discussed a confidential document which purportedly featured the City's conclusion that Mawhinney had committed a racist act.  In addition, Bennett had disseminated the story of Mawhinney's racism to the press.  Although discussing ACFD matters publicly violated ACFD rules and regulations, Bennett was not sanctioned for his disclosures.

6

The City Council did not approve the settlement at the meeting, instead re-listing the resolution seeking its approval for the Council's next meeting.  According to plaintiffs, "City Solicitor Anthony Swan indicated that City Council was intimidated by Bennett and the Vulcans members present at the December 28, 2007 council meeting because of race issues." Nevertheless, Swan reported that the Council would approve the resolution at the next meeting.

After the City Council meeting, Atlantic City Mayor Scott Evans issued a written directive, dated January 2, 2008, stating, "This is a reminder that no one is permitted to communicate with the media on behalf of the City without first obtaining permission from my office."  A week later, Bennett contacted another radio talk show, identified his position with the ACFD, and restated similar comments about Mawhinney's guilt.  On several occasions between January and April of 2008, Bennett repeated the allegations of racism against Mawhinney on the radio.  Despite Mawhinney's requests, Bennett was never disciplined for his actions.

In spite of representations to the contrary, the City Council refused to vote on the resolution twice more, once on January 23, 2008 and again on February 27, 2008.  According to plaintiffs, the Council's inaction was a result of the opposition

of Bennett and the Vulcans.[3]  In the meantime, on January 30,
2008, the Merit System Board of the State of New Jersey
Department of Personnel, the agency handling Mawhinney's appeal
of termination, issued its final administrative determination
concerning Mawhinney and acknowledged the settlement agreement
between Mawhinney and the City.  Further, the Superior Court
agreed to issue an Order of Disposition in relation to
Mawhinney's civil action on the basis of Mawhinney's agreement to
dismiss his suit upon the City's approval of the pending
settlement.

    After the City Council again refused to take action on the
resolution concerning the settlement between Mawhinney and the
City, Mawhinney filed an application, on February 28, 2008, to
enforce the settlement agreement and the Merit System Board's
order.  Finally, on March 12, 2008, the Council voted on the
settlement agreement and rejected it.  As they had done
previously, Bennett and members of the Vulcans attended the
meeting.  During that meeting, Bennett told the Council that he
would have Al Sharpton come to Atlantic City, seemingly inciting

_____

    [3] Plaintiffs' complaint states that, despite advising the
City Solicitor that it would approve the settlement at its
January 23, 2008 meeting, "City Council refused to vote . . .
with the hopes that the Vulcans and . . . Bennett would lose
interest and not appear at the next meeting to oppose the
resolution"; and that, at the February 27, 2008 meeting,
"Councilman Marsh asked twice for a motion on the resolution but
each time it was met with silence by his seven colleagues
[because] they would rather appease Bennett and the Vulcans."

race as a reason to reject the settlement.

In the aftermath of the settlement's rejection, Mawhinney's civil case in the Superior Court was re-listed for trial, and Mawhinney persisted with his motions he had filed with the Merit System Board and the Superior Court which sought to enforce the settlement agreement.  On March 26, 2008, however, the Council revisited the resolution regarding the settlement agreement and, contrary to its March 12th rejection, finally approved the settlement.  Neither Bennett nor any member of the Vulcans attended this meeting.

Following the City Council's approval of the settlement, Bennett continued to make public comments about Mawhinney's alleged racism.

Finally, after the settlement's approval, the final Stipulation of Dismissal in Mawhinney's state action was filed with the Superior Court on April 25, 2008.  The Stipulation provides that Mawhinney agrees to dismiss his claims against "City of Atlantic City, Mayor Lorenzo Langford, Kevin Bennett and Ricky Williams . . . with prejudice in their entirety."

**B.   Michael V. Francesco**

Like Mawhinney, Francesco filed suit against the City, among others, in the Superior Court of New Jersey on December 30, 2005. On October 15, 2007, while the state court action was pending, Bennett informed the Vulcans that Francesco had been

9

impermissibly absent from a job detail.  Francesco denies this allegation.  Nevertheless, the Vulcans directed a letter to the Chief of the ACFD, accusing the administration of disciplining black firefighters more severely than white firefighters.[4]  The letter demanded that Francesco be punished for his absence.

An investigation was conducted and revealed that Bennett had misrepresented information pertaining to Francesco's alleged absence and had failed to properly carry out orders.  Bennett was not disciplined.  The written investigative report found the Vulcans' complaint to be "baseless and factually wrong."

On February 8, 2008, the Superior Court entered an Order of Disposition in Francesco's state court action against the City and others.[5]  The order was predicated upon a settlement agreement between Francesco and the City whereby the City agreed to pay Francesco approximately $75,000.  The court ordered that Francesco's suit "is hereby disposed of as follows: Settled while scheduled for trial."

---

[4] According to plaintiffs, Bennett and the Vulcans have a "direct line of unimpeded communication with Barbara Camper, the Affirmative Action officer," who is an African-American female and who "entertains each and every complaint [they make], baseless or not," and "continuously intervenes on [their] behalf . . . without investigation into the merits of their claims." Plaintiffs allege that she assists Bennett and the Vulcans indiscriminately because of race.  In this matter, plaintiffs state that she helped to direct the letter to the Chief of the ACFD.

[5] Francesco's complaint did not specifically name Bennett.

10

C.    **Federal Suit**

On July 3, 2008, Mawhinney and Francesco filed a complaint in this Court.  In addition to federal and state law claims asserted against the City, the Vulcans, and Cappella, plaintiffs also set forth claims under New Jersey law against Bennett for intentional interference with economic advantage and defamation.[6]

Germane to this matter, plaintiffs allege that Bennett intentionally interfered with their economic advantage by interjecting himself, in his individual capacity and as president of the Vulcans, into Mawhinney's efforts to settle with the City and by encouraging an investigation against Francesco on the basis of frivolous allegations.  In addition, plaintiffs claim that Bennett defamed them by disseminating false information concerning Mawhinney's alleged racism, and by fabricating Francesco's absenteeism in a letter to the Chief of the ACFD.

Bennett has filed a Motion to Dismiss plaintiffs' complaint on the pleadings pursuant to Fed. R. Civ. P. 12(c).  Presently before the Court is Bennett's motion.

III.  **DISCUSSION**

---

[6] On January 11, 2010, as previously noted, the Court addressed motions to dismiss filed by the City and the Vulcans, respectively.  The Court granted the City's motion on the grounds of the entire controversy doctrine and dismissed all of plaintiffs' claims against it.  Further, the Court denied the Vulcans' motion, without prejudice, and continued to exercise its supplemental jurisdiction over plaintiffs' state law claims in this case.

### A.    Standard for Motion for Judgment on the Pleadings

A Rule 12(c) motion for judgment on the pleadings may be filed after the pleadings are closed.  Fed. R. Civ. P. 12(c); Turbe v. Gov't of V.I., 938 F.2d 427, 428 (3d Cir. 1991).  Under Rule 12(c), the movant must clearly establish that "no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law."  Rosenau v. Unifund Corp., 539 F.3d 218, 221 (3d Cir. 2008) (citation and internal quotation marks omitted).  In analyzing a Rule 12(c) motion, a court applies the same legal standards as applicable to a motion filed pursuant to Rule 12(b)(6).  Turbe, 938 F.2d at 428.  Thus, a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff.  Evancho v. Fisher, 423 F.3d 347, 351 (3d Cir. 2005).

Further, although Rule 12(d) provides that a court should treat a Rule 12(b)(6) or 12(c) motion as a motion for summary judgment whenever matters outside the pleadings are considered, the Third Circuit has clarified that "[m]erely attaching documents to a Rule 12(c) motion, however, does not convert it to a motion under Rule 56."  CitiSteel USA, Inc. v. GE, 78 Fed. Appx. 832, 834-35 (3d Cir. 2003).  In ruling on a motion to dismiss, a court has "'discretion to address evidence outside the complaint . . . .'"  Id. at 835 (quoting Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 559 (3d Cir. 2002)).

12

Thus, the court "'may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.'"  Id. (quoting PBGC v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993)).

Ultimately, a district court, in weighing a motion to dismiss, asks "'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim.'"  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 563 n.8 (2007) (quoting Scheuer v. Rhoades, 416 U.S. 232, 236 (1974)); see Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) ("The Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element.  This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." (quoting Twombly, 550 U.S. at 556)).  A court need not credit either "'bald assertions'" or "'legal conclusions'" in a complaint when deciding a motion to dismiss.  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429-30 (3d Cir. 1997).  Similarly, "[a] motion for judgment on the pleadings, like a motion to dismiss, will be granted if the plaintiff has not articulated enough facts

13

to 'raise a right to relief above the speculative level.'"
Bangura v. City of Philadelphia, 2009 U.S. App. LEXIS 16672, at
*8 (3d Cir. Jul. 29, 2009) (quoting Twombly, 550 U.S. at 555).
The defendant bears the burden of showing that no claim has been
presented.  Hedges v. U.S., 404 F.3d 744, 750 (3d Cir. 2005).

**B.   Notice of Tort Claim**

Bennett argues that plaintiffs' claims of intentional
interference with economic advantage and defamation should be
dismissed because plaintiffs failed to file a notice of tort
claim as required by the New Jersey Tort Claims Act, N.J.S.A.
59:1-1 et seq.  Because he is a public employee and plaintiffs'
claims are related to alleged torts he committed in connection
with his employment, Bennett contends that plaintiffs were
statutorily required to timely file a tort claim notice.  It is
undisputed that plaintiffs did not file a notice in respect to
their claims against Bennett.[7]  Therefore, Bennett concludes that

---

[7] Bennett provides the Court with the affidavit of Rosemary
Adams, a City clerk, who avers that plaintiffs have not furnished
a notice of tort claim in connection with their suit against
Bennett.  Additionally, Bennett proffers a copy of a tort claim
notice that plaintiffs filed as part of their suit in New Jersey
Superior Court in 2004.  Only the City and Mayor Lorenzo T.
Langford are named as defendants in the notice, and the notice
predates the alleged incidents on which the present complaint
against Bennett is grounded.  For their present suit, plaintiffs
do not suggest that they satisfied or substantially complied with
the tort notice requirements.

plaintiffs' claims against him must be dismissed.[8]

Plaintiffs disagree, explaining that their claims against Bennett allege tortious conduct that he committed individually and as a representative of the Vulcans, a private organization, and not as a public employee. Because they do not pursue any tort claims against Bennett in his professional capacity or for any actions he committed as a public employee, no tort claim notice was necessary.

The Tort Claims Act ("TCA") provides the procedures for asserting claims against public entities and public employees. Hernandez v. City of Union City, 264 F. App'x 221, 224 (3d Cir. 2008) (citing N.J.S.A. 59:8-3).[9] The TCA "requires a claimant to provide a notice of claim to the public entity or public employee within ninety days of the accrual of a cause of action, or otherwise to move to file a late notice within one year of the accrual date." Id. (citing N.J.S.A. 59:8-8; :8-9). A claimant who fails to comply with the TCA cannot proceed with its claim.

_____

[8] Bennett also asserts that he cannot be subject to plaintiffs' cause of action under the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 et seq. Plaintiffs concede that they have not named Bennett as one of the defendants subject to their NJLAD claim or their Section 1983 claim.

[9] N.J.S.A. 59:8-3 reads, in relevant part:

> No action shall be brought against a public entity or public employee under this act unless the claim upon which it is based shall have been presented in accordance with the procedure set forth in this chapter.

15

See <u>O'Neill v. City of Newark</u>, 701 A.2d 717, 720 (N.J. App. Div. 1997) (citing N.J.S.A. 59:8-3).  Further, the TCA's notice provisions apply both to non-intentional and intentional, common law tort actions committed by public employees.  See <u>Velez v. City of Jersey City</u>, 850 A.2d 1238, 1239, 1244 (N.J. 2004). However, "there must be some nexus between the wrong that is complained of and the defendant's public employment in order to mandate that a notice of claim be filed before suit may be instituted."  <u>Gazzillo v. S. Hunterdon Reg. Bd. of Educ.</u>, 941 A.2d 641, 644 (N.J. App. Div. 2008).

Plaintiffs admit that several of their allegations refer to Bennett acting in his official capacity as a firefighter with the ACFD.  In particular, plaintiffs acknowledge that Bennett's communications with radio stations, during which he mentioned Mawhinney's settlement agreement with the City and accused Mawhinney of being a racist, were undertaken by Bennett in his official capacity.  They also point to the time when Bennett left the firehouse without permission to attend a City Council meeting relating to Mawhinney's settlement agreement.  These averments, say plaintiffs, allege actions by Bennett in his official capacity, but were set forth in support of their Section 1983 claim against the City, not for purposes of any cause of action against Bennett.

On the contrary, plaintiffs profess that their state law

16

claims against Bennett are predicated upon different allegations and occasions during which Bennett acted individually and as president of the Vulcans.  With regard to Mawhinney, plaintiffs allege that Bennett acted in his individual capacity and as the Vulcans' president when he urged Williams to fabricate accusations of racism against Mawhinney and when he protested Mawhinney's settlement agreement with the City before the City Council.[10]  As far as Francesco is concerned, plaintiffs allege that Bennett acted in his individual capacity and as the Vulcans' president when he encouraged the Vulcans to write a letter to the Chief of the ACFD complaining of Francesco's purported absence from work.  Bennett disputes plaintiffs' characterization of his actions, explaining that his alleged conduct was always related to his public employment.

For guidance, the Court looks to the opinion of the Appellate Division of New Jersey in Gazzillo.  In that case, the plaintiff, an employee of a regional board of education, was sexually assaulted by the defendant, another employee of the board of education, on the premises of the region's high school. Gazzillo, 941 A.2d at 642.  Following the altercation, the

_____

[10] Plaintiffs also believe that Bennett acted in his individual capacity when he made false statements accusing Mawhinney of being a racist.  This averment, in and of itself, is too vague and generalized to determine whether Bennett's comments were in anyway related to his public employment.  After all, plaintiffs characterize Bennett's statements on the radio as having been made in connection with his public employment.

defendant pled guilty to the crime of criminal sexual contact, and the plaintiff brought suit against the defendant individually, not naming the school board as a defendant.[11]  Id. at 643.  The Superior Court, however, dismissed the plaintiff's claims against the defendant by virtue of her failure to timely file a notice of tort claim.  Id.

The Appellate Division reversed the court's dismissal, concluding that the failure to file a notice did not extinguish the plaintiff's cause of action against the defendant. Distinguishing the plaintiff's case from prior precedent, the Appellate Division deemed significant the fact that "plaintiff makes no claim at all against the public entity," but rather "seeks recovery only from her assailant."  Id. at 644.  The panel also noted that dismissal of the plaintiff's case would not serve the purposes of the TCA because the public entity already knew of the assault and had the opportunity to take corrective action, and because the defendant's guilty plea rendered any indemnification by the public entity highly unlikely.  Id. Finally, the panel explained that in other cases requiring a notice of claim, "the plaintiffs' claims arose as a result of the public nature of the individual defendants," whereas in this

_____

[11] The plaintiff in Gazzillo had sought to initiate a suit against the public entity prior to suing the individual defendant.  Id. at 642.  The Superior Court, however, refused to grant the plaintiff leave to file a late notice of tort claim. Id.

case, the only connection between the defendant's misconduct and his public employment was that he had assaulted the plaintiff on school premises.  Id.

Based on the reasoning set forth in Gazzillo, plaintiffs were required to file a notice of tort claim in connection with their state law claims against Bennett.  That plaintiffs named Bennett as a defendant in his individual capacity is not dispositive to this issue.  See Hillburn v. Dep't of Corr., 2010 U.S. Dist. LEXIS 15777, at *33 n.15 (D.N.J. Feb. 23, 2010) ("The protection of the NJTCA extends to public officials in regard to intentional and non-intentional torts, and without regard to whether or not the suit is brought against the official in his official or individual capacity."); Lassoff v. N.J., 414 F. Supp. 2d 483, 490 n.19 (D.N.J. 2006) ("Suits against a public officer in his individual capacity are subject to the notice provisions of the TCA even though the public officer is not entitled to immunity under N.J.S.A. § 59:3-14."); see also Velez, 850 A.2d at 1241-46 (holding that claim for assault and battery committed by public official acting outside scope of employment is subject to TCA notice requirements).  Similarly, whether or not Bennett believed he was acting on behalf of the Vulcans or with respect to his duties as a firefighter and captain is irrelevant.  Rather, the critical consideration is the connection between Bennett's alleged misconduct and his public employment.

19

According to plaintiffs, Bennett intentionally interfered with Mawhinney's settlement agreement with the City and defamed Mawhinney by encouraging Williams, a fellow firefighter, to fabricate allegations of racist conduct against Mawhinney and by appearing before the City Council to protest and encumber Mawhinney's agreement.  These allegations arise from and relate directly to Bennett's public employment as a member of the ACFD -- in his capacity as a co-worker and in relation to his knowledge and involvement in ACFD affairs.

In <u>Gazzillo</u>, as recounted above, a public employee sexually assaulted another public employee on school premises.  As the Appellate Division noted in its opinion, apart from the location of the assault, there was no nexus between the defendant's wrongdoing in that case and his public employment.  <u>See</u> <u>Gazzillo</u>, 914 A.2d at 644.  In this case, however, Bennett, a public official, conspired with a co-worker to initiate false charges against another co-worker, allegedly one instance in a course of racially motivated misconduct perpetrated at work by Bennett and tolerated by the City.  Further, Bennett appeared before City Council to comment on a matter related directly to his public employment with the ACFD and for which he seemingly relied on knowledge informed by his public employment.  Even if he appeared as a representative of the Vulcans -- which the complaint does not make explicitly clear -- Bennett's protests before the City

20

Council still unequivocally, and dramatically, implicated his
public employment, his professional position, and actions that
had allegedly occurred at his place of work.  Additionally,
Bennett's conduct before the City Council was part of an alleged
pattern of work-related, racially motivated abuse that he and
other public employees directed at Mawhinney over the course of
time.

The close nexus between Bennett's appearances before the
City Council and his public employment is further illustrated by
plaintiffs' own averments.  In his attempts to thwart Mawhinney's
agreement, plaintiffs claim, Bennett presented to the City
Council a confidential City document concerning Mawhinney's
alleged racist act.[12]  Plaintiffs explain that "Bennett was not
permitted to have or discuss a confidential City document in a
public setting."  This is presumably so because of Bennett's
employment with the ACFD.  Additionally, plaintiffs aver that
despite his appearance before the City Council, as well as his
radio rants, Bennett was never disciplined in accordance with
ACFD rules and regulations that prohibit its employees from
speaking publicly about ACFD business.[13]  Consequently, Bennett's

---

[12] As described in the complaint, it appears that Bennett was
on duty when he left the firehouse and went to the first City
Council meeting at which Mawhinney's settlement was discussed.

[13] Immediately following the averment concerning Bennett's
initial appearance before the City Council, the complaint
provides:

position with the ACFD seemed to both inform his alleged

misconduct and what plaintiffs believed would be a proper

response by the City thereto.[14]

Similarly, Bennett's alleged wrongs against Francesco also

arise from and relate directly to Bennett's public employment.

According to plaintiffs, Bennett encouraged the Vulcans to file a

complaint against Francesco, accusing him of impermissible

absenteeism.  By plaintiffs' own account, however, Bennett was

---

The ACFD has implemented strict rules,
regulations, policies and procedures regarding
the public discussion of ACFD matters.
Indeed, no firefighter is to discuss in a
public forum ACFD business.  Indeed, a General
Order was specifically prepared instructing
all firefighters that they were being directed
not to disclose any information pertaining to
this matter.

Thereafter, plaintiffs allege in the complaint that "ACFD
authorities were aware that Bennett spoke publicly about the
official ACFD matter involving Mawhinney's disciplinary matter,
investigation and settlement agreement," and did nothing about
it.

[14] For purposes of this action, the distinction between
Bennett's appearances on the radio and his appearances before the
City Council is tenuous.  When recounting a couple of his radio
appearances, plaintiffs point out that Bennett was acting in his
official capacity as a fire captain.  Nevertheless, Bennett made
the same statements concerning the same ACFD business on the
radio as he did before the City Council.  Moreover, it seems that
the City's failure to punish Bennett for his radio rants are
tantamount to its failure to punish him for his City Council
appearances.  In fact, in stating the claim against Bennett for
defaming Mawhinney, the complaint's cause of action (enumerated
in Count Four) focuses on Bennett's radio and internet
appearances and does not expressly mention his City Council
appearances.

22

Francesco's captain and had "singled him out for discipline and harasse[d] him."  Thus, Bennett seemingly conjured these false accusations as part of an ongoing effort to denigrate Francesco at work and to threaten his job.  Plaintiffs' complaint makes clear that, on the basis of these accusations against Francesco, Bennett was interviewed by the ACFD and his allegations were discredited.  In fact, plaintiffs even appear to admonish the City for not disciplining Bennett for, among other things, "causing and allowing false information about Francesco" to air. Therefore, it is evident, even by plaintiffs' own acknowledgments, that Bennett's alleged torts against Francesco were part of a purported pattern of work-related, racially motivated harassment that was perpetrated during and/or in connection with Bennett's public employment as a fire captain and should have been subject to departmental discipline.[15]

Finally, by enforcing the TCA in this case, the purpose of its notice provisions is served and vindicated.  By requiring notice even when a public entity may be immune or otherwise may not be liable for its employee's conduct, the TCA still ensures that the public entity has "an opportunity to investigate the claims, and take disciplinary or other appropriate action to

---

[15] The Court is unsure from the complaint which of Bennett's actions informed Francesco's Section 1983 claim against the City if Bennett had not acted in his official capacity when he allegedly defamed Francesco and conspired to have him terminated from his position.

rectify inappropriate behavior or flawed practices," and "to determine whether it will indemnify the [accused] employee." Velez, 850 A.2d at 1244 (citations and internal quotation marks omitted).  That policy is especially significant in this case where plaintiffs sued not only Bennett, but the public entity that employed him as well.[16]  The gravamen of plaintiffs' claims against the City pertained, in part, to the City's refusal to discipline Bennett and its acquiescence to his continuing pattern of misconduct.  Had plaintiffs filed a notice of tort claim, the City may have exacted greater scrutiny when investigating Bennett's alleged wrongs and its own disciplinary and investigatory schemes, thereby inspiring appropriate corrective measures.  By not filing a notice with respect to this federal suit, however, plaintiffs deprived the City of that opportunity.[17]

For the reasons stated above, Bennett's Motion to Dismiss is

---

[16] In reversing the Superior Court's dismissal for lack of notice in Gazzillo, the Appellate Division accorded substantial weight to the fact that the plaintiff had not sued the public entity as part of her action against the public employee.  See Gazzillo, 941 A.2d at 644.

[17] Moreover, plaintiffs had settled prior suits against the City, which may have led the City to believe that all disputes were reconciled.  Mawhinney's suit even named Bennett, but upon stipulating to the case's dismissal, Mawhinney agreed to dismiss all claims against Bennett with prejudice, just as he did with regard to his claims against the City.  A notice of tort claim would have notified the City that, despite the prior settlements, its employees continued to act tortiously.

granted.[18]

## IV.   CONCLUSION

      For the foregoing reasons, Bennett's Motion to Dismiss is granted, and plaintiffs' claims against Bennett are dismissed. An Order consistent with this Opinion will be entered.


Date:   June 22, 2010                    /s/ NOEL L. HILLMAN
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.

---

[18] Because plaintiffs' claims against Bennett are dismissed due to the absence of a notice of tort claim, the Court need not address Bennett's other contention that plaintiffs fail to state a claim for intentional interference with economic advantage upon which relief could be granted.

25